Imperial Car Distributors, Inc., et al. [1] Commissioner. Imperial Car Distributors, Inc. v. Commissioner
Docket Nos. 4654-66, 4655-66, 6734-66.
United States Tax Court
T.C. Memo 1969-12; 1969 Tax Ct. Memo LEXIS 282; 28 T.C.M. (CCH) 49; T.C.M. (RIA) 69012; January 16, 1969, Filed Clement J. Clarke, Jr., and Alan G. Choate, for the petitioners. Dennis C. DeBerry, for the respondent. TANNENWALD
Memorandum Findings of Fact and Opinion TANNENWALD, Judge: Respondent determined deficiencies in petitioners' income taxes as follows: Petitioners
Docket Nos.
Year
Deficiency
Imperial Car Distributors, Inc
4654-66
1961
$16,993.91
6734-66
1962
764.94
1963
604.94
1/1/64 to 8/31/64
223.46
Frederic Royston and Toby L. Royston
4655-66
1961
13,685.81
1962
4,891.81
*283 All dockets were consolidated for trial and decision. After certain concessions by the parties, the issue with respect to the individual petitioners is whether amounts received from the corporate petitioner on the principal of alleged promissory notes constitute amounts received in exchange for indebtedness and are therefore taxable as capital gain under section 1232(a)(1), [2] or constitute distributions under sections 301 and 316 and are therefore taxable as ordinary income. This determination will resolve the issue involving the corporate petitioner, namely, whether any payments with respect to the alleged promissory notes are deductible as interest under section 163. Findings of Fact Some of the facts have been stipulated. These facts and the exhibits attached thereto are incorporated herein by this reference. Frederic Royston (hereinafter referred to as Frederic or, jointly with his wife, as the Roystons) and Toby L. Royston are husband and wife, whose legal residence at the time of filing the petition herein was Philadelphia, Pennsylvania. They filed joint Federal income tax returns for the years *284 1961 and 1962 with the district director of internal revenue, Philadelphia, Pennsylvania. Petitioner Imperial Car Distributors, Inc. (hereinafter Imperial) had its principal place of business at the time of the filing of the petitions herein in Philadelphia, Pennsylvania. It filed corporation income tax returns for the years 1961 through 1963 and for the period January 1 to August 31, 1964 with the district director of internal revenue, Philadelphia, Pennsylvania. Imperial was on a calendar-year accrual basis of accounting during the years in issue and merged into Royston Distributors, Inc., as of August 31, 1964. Imperial was incorporated by J. D. Allen, Jr. (hereinafter Allen or Allen estate) in 50 Virginia in July 1950, with its principal place of business in Hampton, Virginia, for the purpose of distributing automobiles and parts manufactured by British Motor Car Corporation throughout Delaware, Maryland, Virginia, West Virginia, and Washington, D.C.
Allen also operated a sole proprietorship, J. D. Allen, Jr., Importer, which had the regional franchise of MG cars in the same territory. Both franchises were obtained through Hambro Automotive Corporation, wholly owned *285 by Hambro Bank (hereinafter collectively referred to as Hambro), which was the importer and national distributor of cars produced by the British Motor Car Corporation. By 1952, Imperial had 4,000 shares of common stock, having a par value of $25 per share, issued and outstanding, for which $100,000 had been paid in cash. Allen owned all but 13 of said shares. Allen died in September 1952, but his estate continued as the owner of the Imperial shares and also acquired the remaining 13 shares. In September 1953, the estate, Hambro, and Imperial entered into an agreement, the key provisions of which required the estate to pay $35,000 to Hambro, to transfer all the Imperial stock to Hambro, to transfer to Hambro or its nominee all the assets of the J. D. Allen, Jr., Importer, account and to execute a renewal lease on the real property occupied by Imperial for an additional period of five years at an annual rental of $3,000; Hambro was required to apply the $35,000 payment in reduction of outstanding drafts payable to it by the estate, to release the estate of all liabilities to Hambro, and to cancel the estate's car distribution agreement; Imperial was required to assume the balance *286 of principal and interest on all drafts, bank charges, and commissions payable to Hambro by the estate, together with all other liabilities of the J. D. Allen, Jr., Importer, account other than liabilities to David Higgins, Imperial's president. The books of the Importer account showed an excess of liabilities over assets of approximately $125,000 after application of the $35,000 payment. This agreement was closed on October 7, 1953, at which time Hambro delivered to the estate of Allen a note in the amount of $118,351.04, which was forthwith endorsed over and delivered to Imperial. On November 8, 1955, Imperial adopted a plan of dissolution, and a notice of intention to dissolve (Form 966) was filed with the district director of internal revenue, Richmond, Virginia, on December 16, 1955. Imperial then proceeded to liquidate its entire inventory, making the last bulk sale of parts in March 1956 and selling the final car in November 1956. The dissolution proceedings were never formally completed. On or about February 29, 1956, Imperial cancelled the note of Hambro in the amount of $118,351.04 in consideration of the transfer to Imperial of 3,997 shares of Imperial. The remaining *287 three issued and outstanding shares of Imperial had previously been transferred as directors' shares to David Higgins, A. E. Birt, and E. Judels. At the time of this transaction, Imperial was indebted to Hambro in the amount of $129,324.06, consisting of $115,721.28 principal and the balance interest. This indebtedness had arisen in the ordinary course of business from the purchase of cars from Hambro and had been converted into an interest-bearing note payable to Hambro. As of June 30, 1957, Imperial's balance sheet reflected the following: Assets
Cash
$ 569.22
Accounts receivable $3,217.96
Less: Res. for bad debts 1,000.00 2,217.96
Other assets: Rents receivable 2,325.50
Total assets $ 5,112.68
Liabilities
Accrued expenses
$ 14,172.00
Bonds, notes & mortgages payable 115.721.28
Total liabilities $129,893.28
Capital
Capital stock
($18,351.04)
Earned surplus & undivided profits (106,429.56)
Total ($124,780.60) Earlier in June 1957, Imperial had purported to assign its accounts receivable to Hambro. Frederic was president of Royston Distributors, which was franchised by British Motor Car Corporation to distribute cars throughout *288 Pennsylvania and western New York. Frederic desired to acquire the British Motor Car Corporation franchise held by Imperial, including the accompanying lists of dealers. That franchise could be cancelled at will, but British Motors, in accordance with its customary policy, informed Frederic that the franchise could only be acquired by purchase from its owner, Imperial. In the summer of 1957, negotiations began for the acquisition of Imperial by Frederic, 51 Alfred Giardino (hereinafter Giardino), Duncan Charles Merriweather, and Elsie M. Z. Johnson (hereinafter collectively referred to as the investors). As a result, the investors purchased Imperial for $4,150, which was paid as follows: (a) $2,000 to Hambro for Imperial's accounts receivable (which equalled about $3,600 and which Imperial later collected, with the exception of about $50) and the $125,753.10 note representing Imperial's indebtedness to Hambro. (b) $2,000 as a contribution to the capital of Imperial, of which $1,000 was paid to Hambro on account of Imperial's indebtedness to Hambro. (c) $150 for the three issued and outstanding shares of Imperial. The existing Imperial board members were replaced by *289 Frederic, Dwight G. Johnson, and Toby L. Sley (now Toby L. Royston). Three-quarters of a share of Imperial's capital stock was issued to each of the four investors. New notes of Imperial were issued in proportionate amounts to each of the four investors in exchange for the Imperial note payable to Hambro which the investors had acquired. Originally, only the note to Duncan Charles Merriweather bore interest at 6 percent per annum, the notes to the other investors being without interest. In 1959, Elsie Johnson transferred her interest to the other three investors, each of whom received an additional one-quarter share of stock and a note in proportionately increased amount. All of these notes bore interest at 6 percent per annum. From 1957 until August 31, 1964, when it was merged into Royston Distributors, Imperial actively engaged in business as a distributor of cars of British Motors. Imperial reported gross receipts and taxable income as follows: Period ended
Gross receipts
Taxable income
June 30, 1954
$1,120,228.69
($48,969.67)
June 30, 1955
1,620,647.02
1,277.46
June 30, 1956
638,954.29
(112,682.30)
June 30, 1957
6,987.84
(5,700.24)
June 30, 1958
1,840,597.12
79,845.28
June 30, 1959
4,119,292.36
194,181.61
Dec. 31, 1959
2,135,190.73
53,871.26
Dec. 31, 1960
3,628,046.07
25,141.39
Dec. 31, 1961
2,543.860.31
26,386.14
Dec. 31, 1962
2,514,111.04
6,030.41
Dec. 31, 1963
4,953,977.35
58,722.88
Aug. 31, 1964
4,682,023.99
78,320.02
*290 From time to time, commencing in 1961 and as funds were available from profits, Imperial made payments on account of principal of said notes and issued new notes for the unpaid balance. The amount of accrued interest on the promissory notes claimed by Imperial as deductions and disputed herein was $5,321.04 for 1961, $3,653.00 for 1962, $1,163.35 for 1963, and $446.92 for the period ending August 31, 1964. During the years in question, Imperial's cash payments were made to the noteholders and were categorized by Imperial as follows: Royston
Giardino
Merriweather
Total
1961 interest
$ 2,586.48
$ 2,586.48
$2,586.48
$ 7,759.44
principal
20,000.00
20,000.00
10,000.00
50,000.00
1962 interest
1,595.78
1,522.42
1,986.46
5,104.68
principal
10,000.00
10,000.00
10,777.00
30,777.00
Imperial's earnings and profits during 1961 and 1962 were in excess of the foregoing amounts. Ultimate Finding of Fact Imperial's promissory notes to the investors did not represent valid indebtedness for Federal income tax purposes. Opinion The essential issue in this case is whether certain notes which originally constituted valid indebtedness of *291 the petitioner corporation continued to retain that characterization for tax purposes in the hands of the investors after they had purchased the notes and the shares of the petitioner corporation. Petitioners contend that they did and that, therefore, the accrued interest was properly deductible by the petitioner corporation and the payments on account of principal constituted capital gain as amounts received in exchange for indebtedness under section 1232(a)(1). [3] Respondent counters with the assertion that the notes should be treated as equity capital in the hands of the investors so that the payments on account of interest and principal should be treated as 52 dividends under sections 301 and 316. [4] We agree with respondent. *292 The basic facts herein are not in dispute. The investors, including Frederic, acquired the issued and outstanding shares of Imperial and its note to Hambro, on which $129,324.06 was due, in the summer of 1957 for an aggregate payment of $4,150. At the time of the transaction, Imperial had gone into dissolution and stopped doing any business beyond that required for an orderly termination of its affairs, and its remaining gross assets aggregated only slightly in excess of $5,000. Against this factual background, respondent argues that, although the obligation of Imperial to Hambro originally constituted valid indebtedness, it had become worthless in the latter's hands and therefore had lost its debt classification for tax purposes by the time of its transfer to the investor group of which Frederic was a part. We find it unnecessary to resolve the issue thus presented, because we agree with respondent's alternative argument that, even if the obligation continued to retain such classification in the hands of Hambro, it became part of the capital of Imperial and no longer bona fide indebtedness immediately upon its transfer. Only recently, we considered a comparable situation in , *293 on appeal (C.A. 10, July 15, 1968), and we held that, since the notes involved had no independent significance in the purchase transaction, they ceased, forthwith upon transfer, to constitute valid indebtedness in the hands of the purchasers. We consider our decision in Edwards as controlling herein. Indeed, the facts of this case provide an even more compelling instance of lack of independent significance. As in Edwards, the investors herein were after assets, i.e., the residual value of the British Motors franchise, and even those assets were not accorded a substantial value. [5] The negotiations contain no indication that the $4,000 was paid for anything other than the accounts receivable and the franchise. As in Edwards, there was never any suggestion that the assignment of the notes warranted any additional consideration or occupied any special position in the negotiations. From the point of view of the investors, the transfer of the notes simply removed substantial outstanding claims against the business they were acquiring and in no way altered their single-minded purpose of acquiring the franchise. *294 In Edwards, the corporation was actively engaged in business both before and after the transfer. Here, Imperial had stopped doing business and had been substantially liquidated; to be sure, it was not technically dead but it was certainly in rigor mortis. In Edwards, the acquired business had assets in excess of liabilities (other than those acquired by the taxpayers) of approximately $150,000; Imperial's current liabilities were in excess of its assets ($14,172 as compared to $5,112.68). In Edwards, the purchasers paid a substantial amount, $75,000, for that net asset position and $240,000 of notes; the investors herein paid only approximately $4,000 for a deficit position and an indebtedness of $129,000. While we recognize that there is no mathematical ratio in determining whether a business is thinly capitalized, it can hardly be gainsaid that, if the investors had directly advanced $129,000 to Imperial, characterization of such an advance as bona fide indebtedness for tax purposes would have been highly unlikely. E.g., (C.A. 4, 1965); (C. *295 A. 2, 1959), affirming a Memorandum Opinion of this Court; (C. A. 6, 1956), affirming ; . In this connection, we also note that the investors herein treated the notes in such a way as to suggest that they did not consider them genuine indebtedness of Imperial. Initially only the note issued to one of the investors (representing one-fourth of the total) bore interest. Nor does it appear that there was any ascertainable provision for payments on account of 53 principal other than as and when funds derived from profits became available. Such a pattern of treatment is more characteristic of equity capital than debt. We cannot escape the conclusion that the notes herein did not constitute bona fide indebtedness of petitioner corporation during any part of the taxable years before us. A contrary holding would accord form a preeminent position over substance. Cf. , affirmed per curiam (C. A. 5, 1951); see also 1432 *296 (C.A. 2, 1947), affirming per curiam ; . In view of the foregoing, we hold that the petitioner corporation is not entitled to deduct the payments on account of interest and the individual petitioners are not entitled to the benefits of section 1232(a)(1) with respect to payments on account of principal. In order to reflect certain concessions by the parties, Decisions will be entered under Rule 50. Footnotes
1. Cases of the following petitioners are consolidated herewith: Frederic Royston and Toby L. Royston, Docket No. 4655-66, and Imperial Car Distributors, Inc., Docket No. 6734-66.↩
2. All references are to the Internal Revenue Code of 1954, as amended.↩
3. SEC. 1232. BONDS AND OTHER EVIDENCES OF INDEBTEDNESS. (a) General Rule. - For purposes of this subtitle, in the case of bonds, debentures, notes, or certificates or other evidences of indebtedness, which are capital assets in the hands of the taxpayer, and which are issued by any corporation, or government or political subdivision thereof - (1) Retirement. - Amounts received by the holder on retirement of such bonds or other evidences of indebtedness shall be considered as amounts received in exchange therefor (except that in the case of bonds or other evidences of indebtedness issued before January 1, 1955, this paragraph shall apply only to those issued with interest coupons or in registered form, or to those in such form on ↩
4. Respondent makes no contention that the notes did not otherwise qualify for the benefits of section 1232.↩
5. Frederick Royston testified: We fought for the territory and we wanted the territory. * * * said $4,000 is what it is worth. If he had said give me $8,000 I would have given him $8,000. If he had said $12,000 I think I would have given him $12,000 because I wanted the territory and he just said, give me $4,000 and I gave it to him.↩